**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**OLUFEMI AYODELE OLADEJO,**

    **Petitioner,**

    **v.**                                      **Civil Action No. 3:26cv449**

**PAUL PERRY,** *et al.,*

    **Respondents.**

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Petitioner Olufemi Ayodele Oladejo's Renewed Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion" or "Motion for Preliminary Injunction"). (ECF No. 9.)[1] In the Motion, and in Petitioner's accompanying Verified Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 (the "Verified Amended Petition"), Mr. Oladejo argues that his detention by Immigration and Customs Enforcement ("ICE") violates the Immigration and Nationality Act ("INA") and his procedural and substantive due process rights under the Fifth Amendment to the United States Constitution.

For the reasons articulated below, the Court will grant the Motion. (ECF No. 9.) The Court will order Respondents to provide Mr. Oladejo with a bond hearing under 8 U.S.C. § 1226(a).

---

[1] The Court employs the pagination of the CM/ECF docketing system.

### I. Factual and Procedural Background

**A.      Factual Background**

**1.      Mr. Oladejo Lawfully Arrives in the United States**

Mr. Oladejo is a native and citizen of Nigeria.  (ECF No. 8 ¶¶ 12, 18.)  In 2018, Petitioner entered the United States on a B-2 visitor visa.  (ECF No. 13, at 14; ECF No. 14, at 3.)  Although his visa expired in 2018, Mr. Oladejo has resided in the United States since he arrived in 2018.  (ECF No. 8 ¶ 18.)  Respondents submit that he "has filed various applications for relief" that have not been granted.  (ECF No. 14, at 3.)  Petitioner has a pending "Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant (VAWA)."  (ECF No. 8 ¶ 19; ECF No. 8-1, at 3.)

Mr. Oladejo is an ordained Christian pastor.  (ECF No. 8 ¶ 1.)  Since 2020, Mr. Oladejo "has served as the senior pastor of Promiseland International Christian Center in Dallas, Texas, where he is an active community leader engaged in charitable and outreach work."  (ECF No. 8 ¶ 18.)

**2.      USCIS Grants Mr. Oladejo's Request for Advance Parole**

In May 2024, Mr. Oladejo applied for advance parole in order to travel abroad.[2]  (ECF No. 8 ¶ 20; ECF No. 8-1, at 5.)  In January 2025, the United States Citizenship and Immigration Services ("USCIS") approved Mr. Oladejo's application and granted him advance parole for five

_____

[2] The Verified Amended Petition states that Mr. Oladejo applied for advance parole in January 2025.  (ECF No. 8 ¶ 20.)  Mr. Oladejo's advance parole form indicates that he applied for advance parole on May 28, 2024, and that USCIS granted his request in January 2025.  (ECF No. 8-1, at 5.)  Whether Mr. Oladejo applied for advance parole in May 2024 or January 2025 is not material to this Court's consideration of the Motion.

2

years, from January 2025 until January 2030.  (ECF No. 8 ¶ 20; ECF No. 8-1, at 5.)  The USCIS

form approving Mr. Oladejo's application for advance parole provides:

> We have approved your application for an Advance Parole or TPS Travel Authorization Document.  Your travel document will be mailed to you separately and will show the validity of the document and any travel conditions.
>
> How to Use Your Advance Parole or TPS Travel Authorization Document
>
> You should take your passport and the Advance Parole or TPS Travel Authorization Document when you leave the U.S.  You cannot use the Advance Parole or TPS Travel Authorization Document in place of your passport.  When you return to the U.S., present the Advance Parole or Travel Authorization Document to the U.S. Customs and Border Protection (CBP) officer who inspects you at the port-of-entry.
>
> Before You Leave the United States
>
> Please note the following information.  If you have been granted an Advance Parole Document:
>
> - Parole into the United States is not guaranteed.  In all cases, a CBP officer must still inspect you at a port of entry to determine whether you are eligible to come into the United States according to the terms of your advance parole.  Even though USCIS approved your advance parole, CBP may still refuse to parole you into the United States.
>
> - Parole into the United States is not an "admission" into the U.S.  If you have a pending Form I-485 and we deny it, you may be subject to removal proceedings for being inadmissible to the U.S.
>
> - If you leave the United States after being unlawfully present in the United States, you may be barred from admission even if you obtained advance parole.  If you were unlawfully present in the United States for more than 180 days but less than one year and you leave the U.S. voluntarily before the start of removal proceedings, you are inadmissible for three years; if you were unlawfully present for one year or more, you are inadmissible for ten years.

(ECF No. 8-1, at 5.)

### 3.     Mr. Oladejo Travels to Nigeria on his Grant of Advance Parole and is Detained at the Airport by Customs and Border Protection

In July 2025, Petitioner purchased roundtrip tickets from Dallas, Texas to Lagos, Nigeria, with travel dates in late November 2025. (ECF No. 8 ¶ 21; ECF No. 8-1, at 7–8.) "On or about November 29, 2025, Petitioner returned to the United States from Lagos, Nigeria, through Dulles International Airport in Dulles, Virginia [("Dulles" or "Dulles Airport")], on his valid Advance Parole document. Upon his return at the designated port of entry, Petitioner was detained by U.S. Customs and Border Protection ('CBP')." (ECF No. 8 ¶ 22.) CBP subsequently transferred Mr. Oladejo to the Caroline Detention Facility in Bowling Green, Virginia. (ECF No. 8 ¶ 22.) Both parties submit that despite his detention, USCIS has not terminated Mr. Oladejo's advance parole, and it remains valid to this day. (*See* ECF No. 13, at 11; ECF No. 19, at 4.)

### 4.     Mr. Oladejo is Placed in Removal Proceedings and an Immigration Judge Denies Mr. Oladejo's Request for Bond

After his arrest, Mr. Oladejo was served with a Notice to Appear,[3] which initiated removal proceedings before the Annandale Immigration Court. (ECF No. 8 ¶ 23; ECF No. 8-1, at 10–12 (Notice to Appear dated December 1, 2025).) On December 15, 2025, Mr. Oladejo appeared for a master calendar hearing before an Immigration Judge. (ECF No. 8 ¶ 24.) Mr. Oladejo made a claim for asylum due to his fear of "return[ing] to Nigeria based on his identity as a Christian pastor subject to religious persecution." (ECF No. 8 ¶ 24.) The Immigration Court continued the matter. (ECF No. 8 ¶ 24.)

On December 29, 2025, Petitioner's counsel filed a Motion for a Bond Hearing with the Immigration Court, arguing that Petitioner's prior grant of advance parole removed him from the

---

[3] A Notice to Appear is a "'[c]harging document' that 'initiates a proceeding before an Immigration Judge.'" *Hasan v. Crawford*, 800 F. Supp. 3d 641, 648 (E.D. Va. 2025) (quoting 8 C.F.R. § 1003.13).

4

category of "arriving aliens" subject to mandatory detention under 8 U.S.C. § 1225, and that he was entitled to a custody redetermination under 8 U.S.C. § 1226(a). (ECF No. 8 ¶ 25.) On January 15, 2026, an Immigration Judge "denied Petitioner's request for a bond hearing on the sole stated ground that '[Mr. Oladejo] is an arriving alien.'" (ECF No. 8 ¶ 26; ECF No. 8-1, at 15–16 (Immigration Court Order).)

On February 4, 2026, an Immigration Judge denied Mr. Oladejo's requests for asylum and withholding of removal and ordered Petitioner removed to Nigeria. (ECF No. 14-1, at 1–4.) Mr. Oladejo appealed the Immigration Judge's removal decision to the Board of Immigration Appeals, and that appeal remains pending. *See* EOIR, Automated Case Information, A-Number 219-084-095, https://acis.eoir.justice.gov/en/caseInformation/ (last visited July 20, 2026). Mr. Oladejo remains detained at the Caroline Detention Facility. (ECF No. 8 ¶ 27.)

### B.    **Procedural Background**

On May 20, 2026, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241, (ECF No. 1), and a Motion for Temporary Restraining Order, (ECF No. 2). On May 21, 2026, the Court denied Mr. Oladejo's Motion for Temporary Restraining Order because the petition did not comply with Rule 2 of the Rules Governing Section 2254 Cases,[4] meaning the Court lacked jurisdiction over the case, and because the Motion for Temporary Restraining Order did not comply with Federal Rule of Civil Procedure 65(b)(1)(B). (ECF No. 4.)

On May 26, 2026, counsel for Respondents entered a Notice of Appearance. (ECF No. 6.)

---

[4] Rule 1(b) of the Rules Governing § 2254 cases permits this Court to apply the Rules Governing § 2254 Cases to petitions under 28 U.S.C. § 2241. Rule 1(b), Rules Governing § 2254 Cases; *see Aguayo v. Harvey*, 476 F.3d 971, 976 (D.C. Cir. 2007).

On June 5, 2026, Mr. Oladejo filed the instant Verified Amended Petition, (ECF No. 8), and the instant Motion, (ECF No. 9). In the Verified Amended Petition, Mr. Oladejo asserts three Counts:

Count I:   Violation of his substantive due process rights under the Fifth Amendment to the United States Constitution;

Count II:   Violation of his procedural due process rights under the Fifth Amendment to the United States Constitution; and,

Count III: Violation of the Immigration and Nationality Act.

(ECF No. 8 ¶¶ 36–46.)

Mr. Oladejo served both the Verified Amended Petition and the Motion on Respondents. (ECF No. 9, at 6.)

On June 8, 2026, the Court entered an Order converting the request for a temporary restraining order to one for a preliminary injunction, setting a hearing on the Motion, and directing the parties to file briefing on three specific issues. (ECF No. 10, at 2.) On June 12, 2026, both parties timely filed their supplemental briefs. (ECF Nos. 13, 14.)

On June 23, 2026, the Court held a preliminary injunction hearing on the Motion (the "Hearing"). (ECF No. 17.) At the Hearing, the Court permitted the parties to file supplemental briefing no later than June 26, 2026. (ECF No. 17.) On June 26, 2026, both parties timely filed their supplemental briefs. (ECF No. 19.)

## II.  Standard of Review

"Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary restraining orders and preliminary injunctions." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017). "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Perry v. Judd*, 471

6

F. App'x 219, 223 (4th Cir. 2012) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Such remedy is "never awarded as of right." *Winter*, 555 U.S. at 24. "[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way." *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (citation omitted). Therefore, preliminary injunctions are "to be granted only sparingly." *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 590–91 (E.D. Va. 2008) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003)).

"[T]o be eligible for a preliminary injunction, the party seeking such relief must demonstrate each of the following factors:  (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and, (4) the public interest." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 491 (E.D. Va. 2016) (footnote omitted) (citing *Winter*, 555 U.S. at 20; *Real Truth About Obama, Inc. v. Fed. Election Comm'n* ("*Real Truth*"), 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010)). "Where, as here, the government is a party, the 'balance of the equities' and 'public interest' prongs of the preliminary injunction test merge." *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 357 (S.D. W. Va. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The party seeking a preliminary injunction bears the burden of establishing that each factor supports granting the injunction. *Real Truth*, 575 F.3d at 346. The proponent must demonstrate each factor by a "clear showing." *Winter*, 555 U.S. at 22.  The failure to show any one of the relevant factors mandates denial of the preliminary injunction. *Real Truth*, 575 F.3d at 346.

7

### III. Analysis

Mr. Oladejo is entitled to a preliminary injunction.  First, Mr. Oladejo has shown a likelihood of success on the merits of his claims under the INA (Count III) and his claims under the Fifth Amendment's Due Process Clause (Count II).[5]  Second, he has shown that he is likely to suffer irreparable harm.  And third and fourth, the balance of the equities weighs in Mr. Oladejo's favor.

### A.      Mr. Oladejo Has Demonstrated a Likelihood of Success on the Merits

The central question posed by Mr. Oladejo's Verified Amended Petition and Motion for Preliminary Injunction is well known by the Court:  whether Petitioner is detained under 8 U.S.C. § 1225's mandatory detention provisions or under 8 U.S.C. § 1226's discretionary detention provisions.  Petitioner contends that he is detained under § 1226's discretionary detention provisions, and that he is entitled to release or a bond hearing under § 1226(a).  (ECF No. 8 ¶¶ 4, 38; ECF No. 12, at 4–8.)[6]  Respondents insist that Mr. Oladejo is an "arriving alien" subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A).  (ECF No. 14, at 4.)

---

[5] Because the Court finds that Mr. Oladejo prevails on his claims in Counts II and III, it does not address his substantive due process claims in Count I. *See Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 590 (N.D.W. Va. 2023) ("In showing a likelihood of success on the merits, a [petitioner] is not required to demonstrate a likelihood of success on all claims.").

In addition, Mr. Oladejo argued in his supplemental briefing and at the Hearing that the length of his detention—approximately seven months—is unreasonably and unconstitutionally prolonged. (ECF No. 13, at 13–14 (citing *C.B. v. Oddo*, No. 3:25-cv-263, 2025 WL 2977870 (W.D. Pa. Oct. 22, 2025) (finding that petitioner's *ten-month* detention was unconstitutionally prolonged).) Because the Court finds that Mr. Oladejo has established that he is detained under § 1226(a) and that Respondents violated his procedural due process rights on other grounds, the Court does not address his length-of-detention claim.

[6] In the Verified Amended Petition and Motion for Preliminary Injunction, Mr. Oladejo argues that he is not subject to § 1225's mandatory detention provisions because immigration regulations create a "carve out" that expressly exclude a noncitizen returning to the United States

8

But the facts of this case present a novel issue: whether 8 U.S.C. § 1225's mandatory detention provisions, or 8 U.S.C. § 1226's discretionary detention provisions, govern the detention of a noncitizen who arrived in the United States legally on a tourist visa; overstayed that visa and built a life in this country over the next eight years; sought, and was granted, advance parole to travel outside the United States; left the United States on that grant of advance parole without notice from Respondents that he could be detained without bond upon attempting to reenter the country; and, who, upon attempting to reenter the United States, was not paroled into the United States, was not told *why* he was not paroled into the United States, and was detained at the border without the opportunity for a bond hearing.

For the reasons articulated below, the Court finds that Mr. Oladejo has made a clear showing that he is likely to succeed on the merits of his claims that his detention violates the

---

on a grant of advance parole from the definition of an "arriving alien." (ECF No. 8 ¶ 38; ECF No. 12, at 4–8); *see* 8 C.F.R. § 1.2 (DHS regulation defining "arriving alien"); 8 C.F.R. § 1001.1(q) (Executive Office of Immigration Review ("EOIR") regulation defining "arriving alien").

The "carve out" Mr. Oladejo cites states:

Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry . . . . However, an arriving alien . . . who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under [8 U.S.C. §1225(b)(1)(A)(i)].

8 C.F.R § 1.2; 8 C.F.R. § 1001.1(q).

By its express terms, the "carve out" only exempts from the definition of "arriving alien" those detained under § 1225*(b)(1)*, not those detained under § 1225*(b)(2)*. Petitioner's counsel conceded at the Hearing that the "carve out" does not apply to Mr. Oladejo, who Respondents contend is detained under § 1225*(b)(2)*, (ECF No. 14, at 4). Accordingly, the Court does not address Mr. Oladejo's argument based solely on the "carve out."

INA (Count III) and his procedural due process rights (Count II). First, Mr. Oladejo's detention is governed by §1226(a)'s discretionary detention provisions, not § 1225(b)'s mandatory provisions, meaning his detention without a bond hearing contravenes the INA. Second, Respondents violated Mr. Oladejo's procedural due process rights under the Fifth Amendment in refusing to provide him with a bond hearing. And third, Respondents violated Mr. Oladejo's procedural due process rights in failing to provide him notice that, if he were to be denied entry to the United States, he would be subject to mandatory detention without the possibility for a bond hearing.

### 1. Mr. Oladejo is Likely to Succeed on Count III Because he is Detained Under § 1226(a)

#### a. Legal Standard: Advance Parole

"'Advance parole' is a practice whereby the government decides in advance of an alien's arrival that the alien will be paroled into the United States when he [or she] arrives at a port-of-entry." *Ibragimov v. Gonzales*, 476 F.3d 125, 132 (2d Cir. 2007). "Advance parole is often granted to aliens residing in the United States who have a need to travel abroad, but whose immigration status would not afford them a right to legal admission upon their return." *Id.* In addition, advance parole allows noncitizens who have a pending application for adjustment of status to depart and return to the country without abandoning that application. *Akhtar v. Dir. of U.S. Citizenship & Immigration Servs. Mt. Laurel Field Off.*, No. 23-1577, 2024 WL 1427634, at *3 (3d Cir. Apr. 3, 2024); *see also* 8 C.F.R. § 245.2(a)(4)(ii)(B) (explaining that the "departure from the United States" of a noncitizen with a pending application for adjustment of status "shall not be deemed an abandonment of the application if he or she was previously granted advance parole").

10

"Advance parole is not explicitly contemplated by the statute governing parole, but is permitted by 8 C.F.R. § 212.5(f)," *Ibragimov*, 476 F.3d at 132, which provides: "Advance authorization. When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued an appropriate document authorizing travel." 8 C.F.R. § 212.5(f).

> **b.      Legal Standard:  Detention Under 8 U.S.C. §§ 1225(b)(1) and (b)(2)**

Two immigration detention provisions are relevant here: 8 U.S.C. § 1225 and 8 U.S.C. § 1226. Section 1225 "applies to *arriving aliens*, whereas § 1226 generally governs the process of arresting and detaining aliens present in the United States pending their removal." *Hasan v. Crawford*, 800 F. Supp. 3d 641, 653 (E.D. Va. 2025) (quotations omitted) (emphasis added). An "arriving alien" is an "applicant for admission coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2; 8 C.F.R. § 1001.1(q). "An alien present in the United States who has not been admitted or who arrives in the United States" is "deemed" an applicant for admission. 8 U.S.C. § 1225(a)(1) (emphasis added).

Applicants for admission are divided into two categories under § 1225: those covered by § 1225(b)(1) and § 1225(b)(2). *Hasan*, 800 F. Supp. 3d at 652. "Section 1225(b)(1) applies to aliens 'initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation,' as well as to other aliens who receive special designation by the Attorney General." *Id.* (first quoting 8 U.S.C. § 1225(b)(1)(A)(i), then citing § 1225(b)(1)(A)(iii)). Section 1225(b)(2) applies to "all other applicants." *Id.* (citing *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018)). Applicants for admission under § 1225(b)(1) are subject to an "expedited removal process," *Jennings*, 583 U.S. at 287, while those subject to § 1225(b)(2) are governed by a non-expedited removal process, *see* 8 U.S.C. § 1225(b)(2).

11

Detention under both §§ 1225(b)(1) and (b)(2) is mandatory. Relevant here, § 1225(b)(2) provides that if an "immigration officer determines that an [applicant for admission] *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien *shall* be detained." 8 U.S.C. § 1225(b)(2)(A) (emphasis added).

To summarize, § 1225's mandatory detention provisions apply to "arriving aliens"—that is, applicants for admission coming or attempting to come into the United States at a port-of-entry. *See* 8 U.S.C. § 1225; 8 C.F.R. § 1.2; 8 C.F.R. § 1001.1(q). But by its express terms, § 1225(b)(2)'s mandatory detention provision applies *only* to applicants for admission who are *seeking admission.* 8 U.S.C. § 1225(b)(2)(A).

### c.    Legal Standard:  Detention Under 8 U.S.C. § 1226

Section 1226, by contrast, "sets forth 'the default rule' for detaining and removing aliens 'already present in the United States.'" *Hasan*, 800 F. Supp. 3d at 652–53 (quoting *Jennings*, 583 U.S. at 303). Section 1226(a) provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Pending the removal decision, the Attorney General "may continue to detain the arrested alien," or release the alien on a "bond of at least $1,500" or "conditional parole." *Id.*

### d.    Mr. Oladejo is Detained Under § 1226(a)

The Court concludes that Mr. Oladejo is not an arriving alien detained under § 1225(b)(2) and is instead detained under § 1226(a) for two reasons:  First, because Mr. Oladejo was not an applicant for admission who was *seeking admission* when he arrived at Dulles Airport, he cannot be detained under § 1225(b)(2). Second, Mr. Oladejo's circumstances—including the long

12

period of time he resided in the United States—make him more similar to § 1226(a) detainee than noncitizens detained under § 1225.  The Court addresses each point in turn below.

As the Court explained above, § 1225(b)(2) subjects *applicants for admission* who are *seeking admission* to mandatory detention.  § 1225(b)(2).  Even assuming Mr. Oladejo was an applicant for admission when he arrived at Dulles Airport, he was not *seeking admission* to the United States.  As this Court has repeatedly explained, § 1225(b)(2)'s "use of the present participle" necessarily implies some sort of present-tense action.'"  *Duarte Escobar v. Perry*, 807 F. Supp. 3d 564, 576 (E.D. Va. 2025) (quoting *Martinez v. Hyde*, 792 F. Supp. 3d 211, 218 (D. Mass. 2025)); *see also Quispe v. Crawford*, No. 1:25-cv-1471 (AJT), 2025 WL 2783799, at *5 (E.D. Va. Sept. 29, 2025) ("[Section 1225(b)(2)(A)] brings within its scope only those individuals *actively seeking* admission into the country, and not those who have already entered the country.") (emphasis added).

Here, the record contains no evidence that Mr. Oladejo took *active* steps to seek admission to the United States while at Dulles Airport in November 2025.  Respondents do not, for example, offer evidence of forms, paperwork, or interview transcripts signed by or involving Mr. Oladejo to indicate that he *actively* sought admission to the United States.  To the contrary, Mr. Oladejo only took *active* steps to reenter the United States *before* he left the country and from inside the United States:  Mr. Oladejo applied for advance parole while in the United States.  USCIS granted Mr. Oladejo's request for advance parole while Petitioner was in the United States.  And Mr. Oladejo bought round-trip tickets from Dallas to Nigeria from within the United States.

That every step Mr. Oladejo took to ensure his admission to the country was taken from *inside* the United States, not at the border, demonstrates that Mr. Oladejo was not *seeking*

13

*admission* when he arrived at Dulles Airport in November 2025. And because Mr. Oladejo was not *seeking admission* at the border, he cannot be detained under § 1225(b)(2). *See Samirah v. Holder*, 627 F.3d 652, 663 (7th Cir. 2010) (relying on the regulatory definition of "arriving alien" and concluding that "an alien granted advance parole is not an arriving alien").

In addition to the fact that Mr. Oladejo does not fit the statutory definition of a § 1225(b)(2) detainee, Mr. Oladejo's circumstances are more similar to most noncitizens detained while residing *inside* the United States—and thus entitled to a discretionary bond hearing under § 1226 because they were not seeking admission—than those detained at the border and subject to mandatory detention under § 1225. Mr. Oladejo arrived in the United States legally and was formally admitted on a visitor visa. Although he overstayed that visa, he lived in the country continuously, serving as a Christian pastor in Dallas, from 2018 until his brief departure in November 2025. (ECF No. 8 ¶ 18.) Mr. Oladejo applied to travel abroad through the appropriate legal channels, and he left the United States only after USCIS provided him with advance parole. Had Mr. Oladejo never traveled abroad, Respondents conceded during the hearing, Mr. Oladejo would be entitled to a bond hearing under § 1226. These facts—his long-term residence, community involvement, and established life in the United States—are the hallmarks that courts around the country, including this Court, have relied on to determine that a noncitizen detained inside the United States is subject to detention under § 1226(a), not § 1225. *See, e.g.*, *Velasquez v. Noem*, No. 3:25-cv-998 (MHL), 2026 WL 279226, at *4 n.14 (E.D. Va. Feb. 3, 2026) (collecting thirty cases in the Eastern District of Virginia alone holding that noncitizens detained in the interior of the United States are detained under § 1226(a)). Like other noncitizens subject to § 1226, Mr. Oladejo lived in the United States for an extended period

14

of time, built a life in the United States, and was not seeking admission while he resided in the United States.[7] He is therefore detained under § 1226(a).

To be sure, Mr. Oladejo's case bears one important difference from most of those cases: CBP arrested and detained Petitioner at a port-of-entry, not in the interior of the United States. But this Court has already explained that, despite his *place* of arrest, Mr. Oladejo does not meet the statutory definition of a noncitizen who can be detained under § 1225. Taking the plain language of the INA together with the circumstances Mr. Oladejo's case presents, Mr. Oladejo has established by a clear showing that he is detained under § 1226(a), not § 1225(b)(2).

Respondents rely on four cases to argue that Mr. Oladejo is an arriving alien. (*See* ECF No. 14, at 3 (citing *Duarte v. Mayorkas*, 27 F.4th 1044 (5th Cir. 2022); *Iredia v. Att'y Gen. of the U.S.*, 25 F.4th 193 (3d Cir. 2022); *Ibragimov v. Gonzales*, 476 F.3d 125 (2d Cir. 2007); *Aslanturk v. Hott*, No. 1:20-cv-433 (RDA), 2020 WL 5745799 (E.D. Va. June 30, 2020)).) For two reasons, none of these cases persuade the Court that Mr. Oladejo is an arriving alien subject to detention under § 1225(b)(2).

First, none of the cases address the central question before this Court: the detention provision—§ 1225(b)(2) or § 1226—that governs when a noncitizen is detained at a port-of-entry after returning to the United States on a grant of advance parole.

_____

[7] Mr. Oladejo did apply for advance parole while he was in the United States. To the extent that his application for advance parole amounts to "seeking admission," the Court notes that Mr. Oladejo was not an applicant for admission when he applied for advance parole. Because Mr. Oladejo was formally admitted to the United States in 2018 on a B-2 visitor visa, *see* 8 U.S.C. § 1101(a)(13), his status when he applied for advance parole was that of a "visa overstay," (ECF No. 19, at 3)—not an applicant for admission. Thus, Mr. Oladejo never fit the statutory definition of a § 1225(b)(2) detainee because he was never an applicant for admission who was seeking admission to the United States.

15

Second, each case involves a noncitizen who returned to the United States on a grant of advance parole and who CBP *actually paroled* into the country. *Duarte*, 27 F.4th at 1049; *Iredia*, 25 F.4th at 195; *Ibragimov*, 476 F.3d at 129; *Aslanturk*, 2020 WL 5745799, at *1. That distinction is crucial:  in each case cited by Respondents, the court determined that the noncitizen was an arriving alien *because* he or she had been paroled into the United States. *See, e.g.*, *Ibragimov*, 476 F.3d at 133 ("[W]hen petitioner returned and was paroled into the United States in July 1998, he was entitled only to the rights of an advance parolee."); *Iredia*, 25 F.4th at 196 ("[B]ecause Iredia was paroled into the United States in 2006, he is considered an arriving alien regardless of his previous admission.") (citing 8 U.S.C. § 1182(d)(5)(A)).

Here, unlike in each case cited by Respondents, neither party contends that Mr. Oladejo is or was a parolee. (*See* ECF No. 19, at 3 (Respondents' briefing explaining that "Petitioner was not paroled into the United States in 2025; he was stopped at the port of entry and detained").) That difference matters because a parolee is treated as though stopped at the border, and is ordinarily subject to mandatory detention once immigration officials decide to terminate their parole. *See* 8 U.S.C. § 1182(d)(5)(A) (humanitarian parole "shall not be regarded as an admission of the alien"); *Seleznev v. Mullin*, No. 3:26-cv-130 (MHL), 2026 WL 907692, at *4 (E.D. Va. Mar. 31, 2026) ("'[A]liens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border.'") (quoting *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020)). Given the parties' agreement that Mr. Oladejo *is not* a parolee, that same reasoning does *not* apply to him. Instead, the framework that best applies to Mr. Oladejo is that of § 1226, which governs those who have not taken active *steps seeking admission* to the country and who have not been admitted to the country on a clearly provisional basis (like parolees).

16

At base, Mr. Oladejo was not seeking admission to the United States when he arrived at Dulles Airport, and his circumstances are more similar to noncitizens detained in the United States than those who are detained at the border, who are not formally admitted to the United States, and who have not resided in the country for years. For these reasons, and in the absence of any on-point precedent compelling an alternative outcome, the Court finds Mr. Oladejo has established by a clear showing that he is detained under § 1226(a), not § 1225(b)(2).

### 2. Mr. Oladejo is Likely to Succeed on Count II Because Respondents Violated His Procedural Due Process Rights

#### a. Legal Standard: The Fifth Amendment's Due Process Clause

The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "To determine whether civil detention violates a detainee's Fifth Amendment procedural due process rights, courts apply the familiar three-part test articulated in *Mathews v. Eldridge.*" *Hasan*, 800 F. Supp. 3d at 659 (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). *Mathews* requires courts to weigh three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and, (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335–36.

17

**b.    Mr. Oladejo's Mandatory Detention Violates His Procedural Due Process Rights**

Mr. Oladejo argues that Respondents have violated his procedural "due process rights under the Fifth Amendment by detaining him without the possibility of bond[ and] without a lawful basis for doing so." (ECF No. 8, at 11.)  The Court agrees.

**i.    *Mathews* Factor One:  Mr. Oladejo's Private Interest in Remaining Free from Physical Detention Weighs in His Favor**

"The interest in being free from physical detention" is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004).  Respondents provide no argument to the contrary.  Accordingly, the first *Mathews* factor weighs heavily in Petitioner's favor.  *See Hasan*, 800 F. Supp. 3d at 657–60 (finding that automatic stay of immigration bond orders violated petitioner's due process rights under *Mathews* factor one); *Quispe*, 2025 WL 2783799, at *8 (same); *Quispe-Ardiles v. Noem*, 1:25-cv-01382 (MSN), 2025 WL 2783800, at *9 (E.D. Va. Sept. 30, 2025) (same).

**ii.    *Mathews* Factor Two:  Mr. Oladejo's Detention Without the Opportunity for a Bond Hearing Presents a Significant Risk of Erroneous Deprivation of Mr. Oladejo's Due Process Rights**

As discussed above, because § 1226 governs Petitioner's detention, Mr. Oladejo is entitled to a bond hearing, which he has not received.  As a result, Mr. Oladejo has not received even the baseline amount of process owed to him based on his detention status.  Respondents again make no argument on this point. Accordingly, "[t]he second *Mathews* factor weighs heavily in Petitioner's favor, as he is presently and erroneously detained under the mandatory detention provisions of § 1225, without an opportunity for a bond hearing." *Bethancourt Soto v. Soto*, 807 F. Supp. 3d 397, 409 (D.N.J. 2025) (emphasis omitted); *see also Hasan*, 800 F. Supp.

18

3d at 660–61; *Quispe*, 2025 WL 2783799, at *8; *Quispe-Ardiles*, 2025 WL 2783800, at *9 (same).

### iii.   *Mathews* Factor Three:  Respondents Have Failed to Make a Sufficient Showing of a Compelling Government Interest in Detaining Mr. Oladejo Without Holding a Bond Hearing

Third and finally, as with *Mathews* factors one and two, Respondents make no argument that they have a compelling governmental interest in detaining Mr. Oladejo.  Nevertheless, the Court acknowledges that "Congress has repeatedly shown that it considers immigration enforcement—even against otherwise non-criminal aliens—to be a vital public interest." *Miranda v. Garland*, 34 F.4th 338, 364 (4th Cir. 2022).  But, as other courts have found, "th[is] interest[] can be adequately protected by the individualized determination of an immigration judge as to whether an individual should be released on bond under section 1226(a) or [Respondents'] ability to have that release decision reviewed under the existing regulations." *Quispe*, 2025 WL 2783799, at *9.  Moreover, if appropriate, bond can be denied in a hearing. The third *Mathews* factor thus weighs in Petitioner's favor as well.

Because all three Mathews factors weigh in his favor, the Court finds that Petitioner's due process rights under the Fifth Amendment have been violated, meaning that he is entitled to a bond hearing.

### c.   Respondents Violated Mr. Oladejo's Due Process Rights by Subjecting Him to Mandatory Detention Without Notice

Respondents also violated Mr. Oladejo's Fifth Amendment due process rights by failing to notify him that he could be subject to mandatory detention without the opportunity for a bond hearing if he left the country on his grant of advance parole but was denied entry at the border.

19

> **i.**   ***Mathews* Factor One:  Mr. Oladejo's Private Interest in Remaining Free from Physical Detention Again Weighs in His Favor**

For the same reasons explained above, Mr. Oladejo's private interest in remaining free from physical detention again weighs in his favor.  *See supra* Section III.A.2.b.i.

> **ii.**   ***Mathews* Factor Two:  Mr. Oladejo's Mandatory Detention Without Notice Presents a Significant Risk of Erroneous Deprivation of His Due Process Rights**

The "fundamental features" of due process include "notice and an opportunity to be heard." *Miranda*, 34 F.4th at 362 (citing *Mathews*, 424 U.S. at 333).  That Mr. Oladejo was not provided notice before he left the United States that he could be detained at the border without bond or any opportunity to challenge his detention poses a significant risk of erroneous deprivation.  *See Shahwan v. Chertoff*, C-05-4218 MMC, 2005 WL 3369991, at *3–4 (N.D. Cal. Dec. 12, 2005).

As described above, Mr. Oladejo was formally admitted to the United States on a visa in 2018.  Although he overstayed that visa, had he been arrested and detained *inside* the United States, he would have been subject to detention under § 1226(a), not § 1225, and thus entitled to a bond hearing.  Nevertheless, because he briefly traveled outside the United States—on a grant of advance parole approved by the United States government before he departed—Respondents now contend that they can detain him, without a bond hearing, and without having provided any notice that he would be subjected to mandatory detention if he was not paroled into the country.  Due process requires that Petitioner receive some notice that upon leaving the United States, his return could result not only in an inability to reenter the country, but also detention without *any* opportunity to be heard.  *Navarro-Aispura v. INS*, 53 F.3d 233, 236 (9th Cir. 1995) (finding that immigration officials could not place noncitizen in exclusion, rather than deportation,

proceedings where the basis for doing so was the noncitizen's departure from the United States on a grant of advance parole because petitioner's advance parole notice failed to adequately notify him of the consequences of his leaving the country on advance parole).

The instant facts are very similar to those presented in *Shahwan v. Chertoff*, No. C-05-4218 MMC, 2005 WL 3369991 (N.D. Cal. Dec. 12, 2005). In *Shahwan*, the petitioner was a citizen of Egypt who entered the United States on a student visa. 2005 WL 3369991, at *1. Twice, Shahwan sought, and was granted, advance parole to travel abroad. *Id.* Both times, he was paroled back into the United States. *Id.* Immigration officials eventually arrested Shahwan and placed him in removal proceedings. *Id.* at *1–2. Shahwan sought a bond hearing before an Immigration Judge, which the Immigration Judge denied for lack of jurisdiction because Shahwan was an "arriving alien." *Id.* at *2. Shahwan then filed a habeas petition in the United States District Court for the Northern District of California, arguing that his due process rights had been violated "because when he applied for advance parole, [immigration officials] did not notify him that he would be barred from having a bond hearing before an [Immigration Judge] if he was placed in removal proceedings thereafter." *Id.* at *3. The *Shahwan* court agreed: although it acknowledged that the advance parole forms Shahwan received placed him on notice of some consequences of that advance parole, they did not provide "any notice, let alone adequate notice, that if he traveled on advanced parole, he would be subject to detention without the possibility of a bond hearing before an [Immigration Judge]." *Id.* at *4.

The same reasoning applies here. As in *Shahwan*, the USCIS advance parole form warned Mr. Oladejo of some of the consequences of traveling abroad, including that

> [p]arole into the United States is not guaranteed. In all cases, a CBP officer must still inspect you at a port of entry to determine whether you are eligible to come into the United States according to the terms of your advance parole. Even though

21

> USCIS approved your advance parole, CBP may still refuse to parole you into the United States.

(ECF No. 8-1, at 5.)

But the advance parole form made no reference to the fact that, should CBP decline to parole Petitioner into the country, he would be subject to mandatory detention without the opportunity for bond. This lack of notice creates a risk of erroneous deprivation—indeed, the Court has found that Mr. Oladejo *is* erroneously detained—meaning that the second *Mathews* factor weighs heavily in Mr. Oladejo's favor.

Respondents insist that Petitioner received adequate notice because he "was notified in advance that there were potential adverse consequences to traveling on advance parole," (ECF No. 19, at 4), and that Petitioner was not entitled to additional notice of potential consequences. This Court already has observed that the form USCIS provided to Mr. Oladejo when approving his advance parole included *several* warnings, including that CBP could decline to parole him into the country. (ECF No. 8-1, at 5.) But Mr. Oladejo does not challenge the constitutionality of CBP's decision not to parole him into the country—he challenges Respondents' determination that he is subject to mandatory detention. Respondents (correctly) do not contend that the document Mr. Oladejo received from USCIS put him on notice that he would be subject to mandatory detention, because USCIS did not tell Mr. Oladejo that.[8]  (*See* ECF No. 8-1, at 5.)

---

[8] As the Court observed during the Hearing, USCIS' advance parole form also failed to advise Mr. Oladejo about how often advance parolees are denied reentry, or how CBP determines that an advance parolee should not be paroled into the United States. When asked at the Hearing about the frequency with which CBP denies advance parolees entry, or its criteria for doing so, Respondents' counsel stated that he believed advance parolees would be paroled into the United States in "the majority of situations." Counsel could not provide specifics about CBP's criteria for determining when or why an advance parolee would be denied reentry, explaining that he was not sure that anything was documented "in terms of [CBP's] thought processes."

Respondents' arguments that Mr. Oladejo was not entitled to any additional notice likewise do not persuade. (ECF No. 19, at 4.) In making this point, Respondents cite three cases that declined to follow *Navarro-Aispura*, a case from the United States Court of Appeals for the Ninth Circuit relied upon by *Shahwan*, which found that a noncitizen's advance parole document failed to provide adequate notice of the consequences that his departing on advance parole would have on his immigration proceedings. 53 F.3d at 236. (ECF No. 19, at 4–6 (citing *Dimenski v. INS*, 275 F.3d 574, 578 (7th Cir. 2001); *Balogun v. United States Att'y Gen.*, 304 F.3d 1303, 1311–12 (11th Cir. 2022); *Tapia v. Gonzales*, 192 F. App'x 436 (6th Cir. 2006)).) Relying on *Dimenski*, *Balogun*, and *Tapia*, Respondents assert that the "clear weight of authority indicates that Respondents owed no duty, constitutional or otherwise, to advise Petitioner of the consequences of traveling on advance parole." (ECF No. 19, at 6.) Only one of these cases even remotely addresses the issue before the Court, and it is distinguishable.[9]

---

Neither counsel for Respondents nor Mr. Oladejo know why CBP did not parole Petitioner into the country.

Respondents' counsel's statements at the Hearing highlight additional due process concerns. Notwithstanding the warning language on USCIS' form, that CBP rarely declines to parole an advance parolee into the United States makes it reasonable for an advance parolee to assume that he or she will be permitted to reenter. This reasonable expectation, combined with CBP's opaque determination process, raises further concern regarding lack of notice and the presence of arbitrary decision-making—hallmarks of due process. *See Samirah v. Holder*, 627 F.3d 652, 663 (7th Cir. 2010) ("The government's insistence that a grant of advance parole creates no right of reentry to the United States . . . comes close to nullifying advance parole; for what applicant for adjustment of status (and thus not yet a lawful resident) would take a chance on leaving the country if he [or she] can be denied reentry on an immigration officer's whim? The Attorney General can abolish advance parole if he [or she] wants, but he [or she] cannot be permitted to make it a trap—a device for luring a nonlawful resident out of the United States so that he [or she] can be permanently excluded from this country without any of the procedural protections that he [or she] would enjoy, if remaining in the United States.").

[9] Respondents also cite *Shehata v. United States Immigration and Customs Enforcement*, No. 1:14-cv-616, 2015 WL 145054 (S.D. Ohio Jan. 12, 2015), which, at first blush, bears a striking resemblance to *Shahwan* and the instant case. In *Shehata*, the noncitizen petitioner

23

In *Balogun v. United States Attorney General*, a noncitizen petitioner whose criminal record rendered him ineligible for legal status in the United States, and who was removed from the country, challenged his removal on the grounds that the information in his advance parole notice did not adequately inform him of the potential immigration consequences of traveling abroad on advance parole. 304 F.3d 1303, 1309–10 (11th Cir. 2002). Unlike Mr. Oladejo, Balogun did not challenge that the advance parole document improperly informed him about his detention consequences but instead argued that it failed to inform him that he could be ineligible for certain immigration relief. *Id.* The United States Court of Appeals for the Eleventh Circuit rejected his constitutional due process argument for two reasons. First, the *Balogun* court observed that the "only prejudice suffered by Balogun [was] that he . . . lost the *possibility* of discretionary relief at some point in the future." *Id.* at 1311 (emphasis in original). Second, the *Balogun* court explained that immigration officials have "no duty, constitutional or otherwise, to

---

sought a writ of habeas corpus on the ground that his mandatory detention pending removal proceedings violated his procedural due process rights because the advance parole form "did not provide sufficient notice of the adverse consequences of departing the United States," including that it would "make him an arriving alien subject to mandatory detention without a bond hearing if [USCIS] denied his application for adjustment of status and initiated removal proceedings." *Id.* at *1, *3. The *Shehata* court rejected this argument for two reasons: first, because Shehata provided no "evidence of his immigration status before his grant of advance parole" and therefore had "not established that traveling on advance parole deprived him of a right previously available to him." *Id.* at *4. And second, the *Shehata* court cited *Balogun*, *Dimenski*, and *Tapia* for the proposition that immigration officials are not required to provide legal advice. *Id.*

Neither rationale controls here. First, Mr. Oladejo *has* established that he was lawfully admitted to the United States in 2018, and that he would have been eligible for a bond hearing under § 1226(a) had he not left on his grant of advance parole. Second, as the Court explains *infra*, it is not bound by the rationale that immigration officials need not give "legal advice" on advance parole notices, because precedent of the United States Court of Appeals for the Fourth Circuit suggests otherwise.

Thus, although *Shehata* bears several similarities to the instant case, its outcome does not control.

24

provide legal advice to aliens who petition the agency for a grant of advance parole." *Id.* at 1312 (citing *Dimenski*, 275 F.3d at 578).

Neither rationale applies in this case. As to the *Balogun* court's first argument, the prejudice asserted by Mr. Oladejo is not speculative: he is presently detained in immigration custody without the opportunity for bond. With respect to the second argument, that immigration officials have no responsibility to "provide legal advice" to noncitizens on an advance parole form, Respondents' counsel has provided no authority that the United States Court of Appeals for the Fourth Circuit has adopted a similar position. To the contrary, the Fourth Circuit has suggested otherwise. In *Joshi v. District Director, INS,* the Fourth Circuit held that a USCIS form awarding advance parole failed to put the advance parolee on adequate notice of the immigration consequences of traveling on advance parole because the language on the advance parole form was "garbled" and "did not notify [petitioner] that departure, travel, and return pursuant to the advance parole would result in the loss of entitlement to a deportation proceeding." 720 F.2d 799, 802–03 (4th Cir. 1983).[10]

In the end, the Court is persuaded by *Shahwan*, *Navarro-Aispura*, and *Joshi*. As in those cases, the Court concludes that Respondents' failure to notify Mr. Oladejo of the consequences of traveling on advance parole—specifically, that he could be subject to mandatory detention

---

[10] *Dimenski* and *Tapia* also rejected challenges to the adequacy of an advance parole notice based on the proposition that neither immigration law nor the constitution requires immigration officials "to give legal advice, let alone to put that advice in tiny type on forms." *Dimenksi*, 275 F.3d at 578 (citing *West Covina v. Perkins*, 525 U.S. 234 (1999) (holding that due process did not require police seizing property for a criminal investigation to provide notice to the owner of state law remedies that are published and generally available)); *Tapia*, 192 F. App'x at 440 ("'[T]he INS [here, the DHS] has no duty, constitutional or otherwise, to provide legal advice to aliens who petition the agency for a grant of advance parole.'") (quoting *Balogun*, 304 F.3d at 1312) (alterations in original)). For the same reasons articulated above, the Court rejects this rationale as applied in these cases and declines to follow them.

without the opportunity for any hearing—poses a significant risk of erroneous deprivation. The second *Mathews* factor weighs in Mr. Oladejo's favor.

      iii.      **_Mathews_ Factor Three:  Respondents Have Again Failed to Make a Sufficient Showing of a Compelling Government Interest in Not Providing Notice of the Mandatory Detention Consequences of Traveling on Advance Parole**

Third and finally, Respondents make no argument that they have a compelling interest in not providing adequate notice to Mr. Oladejo that traveling on his grant of advance parole could result in mandatory detention. In any event, the Court finds that any burden to the government of notifying advance parolees of the potential for mandatory detention without parole is minor, and this factor weighs in Mr. Oladejo's favor.

As Respondents point out, the advance parole form already includes warnings about several of the consequences of traveling abroad. (ECF No. 19, at 4; ECF No. 8-1, at 5.) The Court cannot find that providing individuals with notice—potentially by merely adding a line or two about the possibility for mandatory detention on USCIS' advance parole forms—would impose on Respondents an unmanageable "fiscal or administrative burden." *Mathews*, 424 U.S. at 335–36. Thus, the third *Mathews* factor weighs in Mr. Oladejo's favor.

The Court concludes that Petitioner has established that Respondents' failure to notify Petitioner that his departure on advance parole could result in his mandatory detention without the opportunity for a bond hearing or to otherwise be heard violates his procedural due process rights.

In sum, Mr. Oladejo has made a clear showing that he is likely to prevail on his claims under the INA (Count III) and under the Fifth Amendment (Count II), so the first *Winter* factor

26

weighs in his favor.  The Court next considers whether Mr. Oladejo faces a likelihood of irreparable harm.

### B.    Mr. Oladejo Faces a Likelihood of Irreparable Harm

Mr. Oladejo argues that the "loss of liberty resulting from continued custody after denial of a bond hearing constitutes irreparable harm." (ECF No. 12, at 8 (quotation and alterations omitted).)  Counsel for Respondents conceded at the Hearing that, should the Court find that Mr. Oladejo is wrongfully detained and thus likely to prevail on the merits, his continued detention presents a likelihood of irreparable harm.

As the Fourth Circuit and the United States Supreme Court have recognized, "deprivation of a constitutional right, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Miranda*, 34 F.4th at 365 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  As the parties correctly argue, Respondents have violated Mr. Oladejo's statutory rights under the INA, and his procedural due process rights under the Fifth Amendment.  Those violations "unquestionably" constitute an irreparable injury.  *See Miranda*, 34 F.4th at 365; *Sarmiento v. Perry*, 824 F. Supp. 3d 514, 532 (E.D. Va. 2026) (finding that a petitioner's loss of liberty resulting from detention after he or she is denied a bond hearing constitutes irreparable harm); *Henandez Marcelo v. Trump*, 801 F. Supp. 3d 807, 823–24 (S.D. Iowa 2025) (same).

Accordingly, Mr. Oladejo has made a clear showing that his continued detention without a bond hearing creates a likelihood of irreparable harm.  The second *Winter* factor weighs in Petitioner's favor.

27

**C.      The Balance of the Equities and the Public Interest Favor Preliminary Injunctive Relief**

Finally, Mr. Oladejo's continued detention without a bond hearing must be balanced against the injury an injunction would inflict on Respondents and the public interest in granting preliminary relief.  The balance of equities and the public interest favor Mr. Oladejo.

The Court recognizes, as Respondents argued at the Hearing, that the United States maintains an interest in the enforcement of its immigration laws.  *See Miranda*, 34 F.4th at 364 ("Congress has repeatedly shown that it considers immigration enforcement—even against otherwise non-criminal aliens—to be a vital public interest[.]"); *Hasan*, 800 F. Supp. 3d at 661 ("Of course, ensuring that persons subject to removal do not commit crimes or evade law enforcement is a significant governmental interest.") (quotation omitted).  But that interest extends only so far as Respondents properly—and constitutionally—do so.  *See Hernandez Marcelo*, 801 F. Supp. 3d at 824–25.  Here, the Court has found that Respondents acted contrary to the INA and in violation of Mr. Oladejo's constitutional rights in at least three ways.  Respondents "do not have [a]n interest in[] violation of the plain text of federal law." *Id.*

Moreover, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  Because the Court has found that Respondents repeatedly acted contrary to the INA and the United States Constitution, the public interest favors granting Mr. Oladejo a preliminary injunction.

### IV.  Scope of Relief

In the Motion, Mr. Oladejo seeks release from detention or a bond hearing where Respondents bear the burden of proving that he poses a risk of danger or a risk of flight.  (ECF No. 12, at 10–12.)  At the Hearing, Respondents' counsel explained that, should the Court find

that Petitioner has carried his burden under the *Winter* factors, a bond hearing rather than release would be the appropriate remedy.

For three reasons, the Court will order Respondents to provide Mr. Oladejo with a bond hearing rather than immediate release. But the Court will require Respondents to bear the burden of proof at that bond hearing.

First, ordering a bond hearing allows the Court to tailor its remedy to the specific injury alleged by Mr. Oladejo: deprivation of his access to a bond hearing. *Avelar Ramos v. Bondi*, No. 3:26-cv-112 (MHL), 2026 WL 614875, at *5 (E.D. Va. Mar 4, 2026). Second, providing Mr. Oladejo with a bond hearing aligns with the INA's statutory scheme, through which Congress and DHS, in enacting § 1226 and promulgating its implementing regulations, "have determined that an Immigration Judge is best situated to make a determination about whether an alien is a potential danger to the community or is a flight risk." *Id.* at *6. And third, the circumstances in which district courts within the jurisdiction of the United States Court of Appeals for the Fourth Circuit have ordered immediate release instead of a bond hearing do not exist here. *Id.* For example, this Court has neither been "confronted with petitioners who have been detained, released, and re-detained by immigration officials[,]" nor with evidence of Respondents' failure to comply with this Court's orders. *See id.* The Court will therefore order Respondents to provide Petitioner with a bond hearing rather than order his immediate release.

The Court will require Respondents to carry the burden of proof at that bond hearing. As this Court explained in *Avelar Ramos*, given Respondents' "abject denial of [Mr. Oladejo's] entitlement to a bond hearing, due process calls for additional safeguards to protect that

29

entitlement." 2026 WL 614875, at *7–8.[11]  Requiring Respondents to carry the burden of proof is one such safeguard.

Accordingly, the Court will order Respondents to provide Petitioner with a full and fair bond hearing during which Respondents will bear the burden of showing whether Mr. Oladejo is a danger or a flight risk by clear and convincing evidence.

The Court will reserve final judgment on the merits of the Verified Amended Petition, (ECF No. 8), until after Mr. Oladejo's bond hearing.

### V. Conclusion

In opposing Mr. Oladejo's Motion, Respondents ask this Court to subject to mandatory detention a noncitizen who lawfully entered the United States in 2018, who built a life in this country over the next eight years and served his community in Dallas as a Christian pastor, and who sought and was granted permission from the United States government to travel briefly to his home country.  Respondents offer no explanation as to why Mr. Oladejo was detained at the border, neither contending that he has a criminal record or presents a risk of threat, nor that USCIS terminated his advance parole.  *Cf., e.g., Samirah*, 627 F.3d at 656 (USCIS revoked

---

[11] In *Avelar Ramos*, this Court distinguished circumstances like those here—where a noncitizen petitioner detained under § 1226 was denied a bond hearing—from those addressed in the Fourth Circuit's decision in *Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022).  *Avelar Ramos*, 2026 WL 614875, at *7–8.  As this Court explained, the *Miranda* court held that placing the burden of proof on a noncitizen to prove that he or she was not a risk of danger or a risk of flight did not violate due process because Miranda was afforded *three opportunities* to seek release from detention.  *Id.* (citing *Miranda*, 34 F.4th at 358–65).

The present situation, as in *Avelar Ramos*, differs from that at issue in *Miranda* because Mr. Oladejo "has been denied access to a bond hearing entirely."  *Id.*; *see also Pineda-Medrano v. Bondi*, No. 1:25-cv-01870 (AJT), 2025 WL 3472152, at *3 n.5 (E.D. Va. Dec. 3, 2025) ("[N]owhere in [*Miranda*] did the Fourth Circuit hold—explicitly or implicitly—that the failure to comport with the procedures contemplated in section 1226(a), including the provision of a bond determination hearing, would also satisfy due process.").

30

plaintiff's advance parole while he was out of the country because he presented a "security risk"). Yet they insist that Petitioner, simply by his physical presence at the border, must be detained. Neither the INA nor the Constitution permit such an outcome.

For the reasons articulated above, Mr. Oladejo has made a clear showing that he is likely to succeed on the merits of his claim that his detention violates provisions of the INA (Count III) and the Fifth Amendment (Count II), that his continued detention presents a likelihood of irreparable harm, and that the balances of the equities and public interest favor preliminary injunctive relief. Accordingly, the Court will grant the Motion for Preliminary Injunction, (ECF No. 9), and order Respondents to provide Mr. Oladejo with a full and fair bond hearing during which Respondents will bear the burden of showing that Mr. Oladejo is a danger or a flight risk by clear and convincing evidence. *Avelar Ramos*, 2026 WL 614875, at *7–8.

The Court finds that a security is unnecessary in this case and will waive any requirement by Petitioner to post one. *See* Fed. R. Civ. P. 65(c); *Pashby v. Delia*, 709 F.3d 307, 331–32 (4th Cir. 2013) ("[A] district court retains the discretion to set the bond amount as it sees fit or waive the security requirement.").

An appropriate Order shall issue.

Date: 7/21/26
Richmond, Virginia

_____/s/_____
M. Hannah Lauck
Chief United States District Judge

31